## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **TOMMY J. RATLIFF** | **CIVIL ACTION** |
| **VERSUS** | **NO:     14-2010** |
| **CAROLYN W. COLVIN,**<br>**ACTING COMMISSIONER OF**<br>**SOCIAL SECURITY** | **SECTION: "J" (4)** |

## REPORT AND RECOMMENDATION

### I.    Introduction

This is an action for judicial review of a final decision of the Commissioner of Social Security pursuant to **Title 42 U.S.C. § 405(g)**.  The Commissioner denied Tommy J. Ratliff's claim for Supplemental Security Income ("SSI").

The matter was referred to the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(b) and Local Rule 19.02E(b), for the submission of Proposed Findings and Recommendations.

### II.    Factual Summary

The claimant, Tommy J. Ratliff ("Ratliff"), was a forty-five year-old male who completed three years of college.[1]  He worked with handicapped children, which consisted of watching them and taking them to lunch. (Tr. Tr. 55, Document 11-2) He protectively filed an application for

---

[1] On February 4, 2015, Jackie Genco, Ratliff's mother, filed a Motion to Substitute (R. Doc. 14) and informed the Court that Ratliff had died. Pursuant to 42 U.S.C 202, Genco sought and the Court granted her motion to substitute Ratliff's two minor children, represented by Genco, in the instant action in favor of their deceased father. *Id.* at 1.

Supplemental Security Income alleging disability, which began in October 2008, due to arthritis in all joints, malignant tumor in his right lung, heart attack, and severe mental impairment. (Tr. 126)

On October 25, 2011, Ratliff had a hearing before Administrative Law Judge Christopher Juge ("ALJ") in New Orleans, Louisiana.   (Tr. 100-112)   On January 17, 2012, the ALJ issued an opinion finding that Ratliff was not entitled to Supplemental Security Income.   (Id.)   Ratliff appealed the finding and the Appeals Council reversed the decision of the ALJ with specific instructions on November 28, 2012. (Tr. 109-112)

The ALJ was instructed to: (1) evaluate Ratliff's mental impairment and make specific findings; (2) give further consideration to Ratliff's maximum residual functional capacity and provide reasons with specific record references; (3) evaluate evidence from a vocational expert to clarify the effect of the assessed limitation; (4) determine whether Ratliff is disabled considering all of the impairments, including drug addiction and alcoholism.   (Tr. 111)

Ratliff seeks review of the denial of his claim for benefits. In doing so, he points to several errors of the ALJ.   He contends that the ALJ: (1) consideration of the single decision maker's findings ("SDM") constitutes reversible error; (2) erred because his residual functional capacity finding is not supported by substantial evidence; and (3) abused his discretion. (Doc. 12)

In contrast, the government contends that the ALJ did not err in: (1) evaluating the single decision maker's findings; (2) his residual functional capacity assessment because it is supported by substantial evidence; and (3) the exercise of his discretion.

Having set forth the position of the parties, the Court will now proceed with its analysis of the matter.

### III.   <u>Standard of Review</u>

The role of this Court on judicial review under Title 42 U.S.C. § 405(g) is to determine

whether there is substantial evidence in the record to support the determination of the fact finder. The Court may not re-weigh the evidence, try issues *de novo*, or substitute its judgment for that of the secretary.  *Allen v. Schweitker*, 642 F.2d 799, 800 (5th Cir. 1981).   If supported by substantial evidence, the Commissioner's findings are conclusive and must be affirmed.  *Richardson v. Perales*, 402 U.S. 389 (1971); *see also Wilkinson v. Schweiker*, 640 F.2d 743, 744 (5th Cir. 1981) (citations omitted).

Substantial evidence is more than a scintilla and less than a preponderance, and is considered relevant such that a reasonable mind might accept it as adequate to support a conclusion.  *See Richardson*, 402 U.S. 389 at 401.   It must do more than create a suspicion of the existence of the fact to be established, but no "substantial evidence" will be found only where there is a "conspicuous absence of credible choices" or "contrary medical evidence."  *Payne v. Weinberger*, 480 F.2d 1006, 1007 (5th Cir. 1973); *Hemphill v. Weinberger*, 483 F.2d 1137, 1138 (5th Cir. 1973).

The concept of disability is defined in the Social Security Act, as the "inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted . . . for a continuous period of not less than twelve months."  *See* 42 U.S.C. §§ 416(i)(1), 423 (d)(1)(A).   Section 423(d)(3) of the Act further defines "physical or mental impairment" as meaning "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  *See* 42 U.S.C. § 423(d)(3).

In determining whether a claimant is capable of engaging in any substantial gainful activity, the Secretary applies a five-step sequential, evaluation process. *See Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). The rules governing the steps of this evaluation process are: (1) a

claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe impairment"; (3) a claimant whose impairment meets or is equivalent to an impairment listed in Appendix 1 of the regulations will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled"; and (5) if the claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and residual functional capacity must be considered to determine whether he can do other work. *See Villa*, 895 F.2d at 1021.

The burden of proof is on the claimant for the first four steps, but shifts to the Secretary at step five. *Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989).

## IV.   **Single Decision Maker's ("SDM") Findings**

Ratliff alleges that the ALJ failed to clearly identify the impairments that he considered severe, failed to conclude that any of his physical ailments were severe, and failed to find that any of his mental impairments were severe, in violation of Title 20 C.F.R. 404. 1521 and 20 C.F.R. 404.1520. As a result, Ratliff contends that the ALJ's decision is not based upon substantial evidence.

The government, in contrast, contends that the ALJ did not err in evaluating the single decision maker's findings. The government contends that the ALJ in addition to considering the opinion of Charles Lee, M.D., the state agency reviewing doctor, also considered the physical examination reports and the medical staff descriptions of actual physical activity in determining that Ratliff could perform a full range of light work. (Rec. Doc. 10) Therefore, the government contends that the ALJ's finding was harmless error because the ALJ considered all of the evidence

in the record and did not rely on the single decision maker's statements to formulate Ratliff's residual functional capacity.

The ALJ, according to the record, concluded that Ratliff has the residual functional capacity to perform the full range of light work.   He referred to medical evidence of 2008 through 2011 and concluded that Ratliff has had a history of back injury, rheumatoid arthritis, asthma, a heart attack, and anxiety disorder. (Tr. 28) The ALJ further noted that the medical evidence indicated that Ratliff had a long-standing treatment relationship with a rheumatologist, where he received OxyContin, Xanax, and Soma for several years.   He also noted that during the visits, Ratliff's physical examination findings were essentially unchanged throughout the years, according to Dr. Spady's notes, but do not appear to be documented in other physical examination reports. (Tr. 29)

He also found that although Ratliff was diagnosed with chronic obstructive pulmonary disease in October 2009, his pulmonary function studies were normal or otherwise unremarkable. He noted that the CT scan of Ratliff's thorax was also unremarkable, with mild multilevel Schmorl's nodes and anterior spurning at the T11 level which showed minimal degenerative to mild minimal degenerative changes. (Tr. 30)   The ALJ also noted that Ratliff experienced chest pain associated with diaphoresis, nausea, and chills.

Although withdrawal was suspected as a possible cause of his symptoms, he nevertheless was admitted to North Oaks Hospital for evaluation. (Tr. 30) The ALJ noted that during Ratliff's cardiac consultation a diagnostic test, an EKG Myoview Spect Stress test, and a CT scan of his chest were all unremarkable. (Tr. 30)   While Ratliff's evaluations were unremarkable, he was diagnosed with compensated systolic heart failure, chest pain, a benign lung nodule, and instructed to return within a year.   (Id.)

5

The ALJ noted that two days after being discharged from the hospital, Ratliff' returned with complaints of chest pain and chronic low back pain.   He told the intake doctor that he had been diagnosed with a "mild heart attack" a few days earlier, yet his cardiac work-up remained negative.   (Id.)   Due to the nature of his complaints and the negative test results, the ALJ noted that Ratliff was referred for a psychiatric evaluation.   He noted the psychiatrist's findings that Ratliff appeared very anxious and diagnosed him with atypical chest and low back pain, depression, anxiety, panic disorder and chronic musculoskeletal, which is pain that affects the muscles, ligaments, tendons, and bones. (Tr. 31)

The ALJ noted Ratliff visited North Oaks on several additional times with complaints of pain and requests for pain medication.   He further noted that when one physician looked at the Louisiana Board of Pharmacy database profile, he noticed that Ratliff's prescription history indicated that he had recent prescriptions and was seeking additional medication because "of his recent diagnosis of lung cancer, a death in his family and a recent heart attack."   (Tr. 31).   The ALJ noted that the attending physician diagnosed him with drug seeking behavior and referred him to the Hammond Center for Addictive Disorders. The ALJ noted that there is no evidence that Ratliff ever received formal mental health evaluation or treatment.   (Tr. 31)

The ALJ further noted Dr. Spady's findings, which referenced his various medical problems, and her findings of Ratliff's limitations of not being able to sit, stand, or walk longer than 15 minutes; or lift, carry, or handle objects weighing more than five pounds. The ALJ further noted all of the medications that Dr. Spady indicated that Ratliff was taking. The AJL noted Dr. Spady's conclusion that Ratliff could not work in any capacity due to the chronic nature of his problems. (Tr. 31)

The ALJ went through the medical records of Dr. Summers at great length, noting the repeated occasions when Ratliff sought additional medications due to pain.   He pointed out that when Ratliff was given Narcana, a drug used for the complete or partial reversal of opioid overdose, he became upset and tried to pull out his IV.   The ALJ noted that Ratliff was diagnosed with drug abuse and pain medication misuse.

The ALJ properly noted that the SDM's opinion of February 11, 2011, was not entitled to any weight; however, he proceed to give partial weight to the opinion that Ratliff remained capable of performing less than a full range of light exertional level of work.

The Court agrees with the parties that the ALJ's reliance on the SDM's opinion was indeed an error. *See Casey v. Astrue,* 2008 WL 2509030, at *4 n. 3 (S.D. Ala. June 19, 2008)("[A]n RFC assessment completed by a disability specialist is entitled to no weight."); *Velasquez v. Astrue*, 2008 WL 791950, at *3 (D. Colo. Mar. 20, 2008) (holding that an opinion of a SDM is "entitled to no weight as a medical opinion, nor to consideration as evidence from other non-medical sources"); *Bolton v. Astrue,* 2008 WL 2038513, at *4 (M.D. Fla. May 12, 2008)(an SDM is not a medical professional, and a finding from an SDM is entitled to no weight as a medical opinion, nor to consideration as evidence from other non-medical sources). However, this dispute centers on whether this error was substantial or harmless.

Here, any error regarding the weight given to the SDM was harmless because the ALJ conducted a thorough review of the medical records and considered all of the evidence in the record, which included opinions by Ratliff's treating physician. *See Cooper v. SSA*, 521 Fed. Appx 803, 808 (11th Cir. 2013).

The ALJ further considered the objective evidence of record, which contained

contradictions between Ratliff's complaints and the treating physicians' observations. Therefore, while the ALJ erred in assigning weight to the finding of the SDM, the error was harmless and the opinion is based upon substantial evidence.

## V.      The ALJ's RFC Finding

### A.      Rheumatoid Arthritis

Ratliff contends that the ALJ's finding regarding Ratliff's Residual Functional Capacity Assessment is not based upon substantial evidence.   Ratliff contends that his treating physician's examinations are considered objective, medical evidence. He further contends that contrary to the ALJ's finding, there was a positive, objective test in the record that shows a high C-reactive protein level. (R. Doc. 12).

The Commissioner contends that the ALJ made a supported residual functional capacity finding. The Commissioner points out that during the relevant time period, Ratliff's C-reactive protein was within normal limits. (Tr. 1285-86).

The record shows that according to the ALJ, Dr. Spady, a rheumatologist, diagnosed Ratliff with rheumatoid arthritis on May 14, 2012. (Tr. 41) The ALJ noted further that Dr. Spady ordered laboratory tests, including a complete blood count, a comprehensive metabolic panel, a count of rheumatoid factor, and an ESR. (Tr. 41) The ALJ notes that these were "send out" tests and it did not appear that they were performed.   (Id.)

However, the records show that on December 26, 2012, Ratliff went for an office visit and review of his test results with Dr. Espinosa, who had ordered a C-reactive protein test.   The record further indicates that on December 10, 2012, the value of his C-reactive protein was 49.0 out of a range of 45.0-182.0 UG/DL, which is within normal limits. (Tr. 1285-86)

The Court further notes that Ratliff is correct that in June 2010, the diagnostic results of his C-reactive protein was out of range. His test result showed a 0.13, which is out of the reference range of less than .80 mg/dL. (Tr. 465)   This test result, however, preceded the date Ratliff filed his application and cannot be considered because benefits are only payable for the period following the application date, which in this case is September 8, 2010.   *See* 20 C.F.R. § 416.335. (Tr. 465)

Ratliff suggests that the ALJ's decision not to give controlling weight to Dr. Spady's physical examination, in light of the perceived elevated C-reactive protein, rendered his finding reversible.

Having determined that there are no positive C-reactive protein tests during the application period, the Court is left to consider the findings of Dr. Spady without supportive diagnostic test results.   In considering this issue, the Court notes the ALJ properly considered multiple physical examinations.   In so doing, he noted that the Ratliff had no difficulty walking or using his hands or arms.

For example, the ALJ noted that while Ratliff sought treatment because of complaints associated with excruciating foot and ankle pain, he was observed walking about the emergency room several times, while expressing his anger. (Tr. 29)   The ALJ further noted that Ratliff refused a prescription for Ibuprofen and "ambulated" out of the emergency room without even a slight limp. (Tr. 29)   There were multiple entries in the opinion where the ALJ described, in detail, Ratliff's statements of medical difficulty and, when not securing medication, leaving the medical facility on his own power.

Considering the observations noted in the medical record against the backdrop of Dr.

9

Spady's conclusion that Ratliff experienced daily pain, stiffness, and swelling in his joints that prevented him from standing sitting or walking for more than 15 minutes, the ALJ was free to reject those portions of Dr. Spady's opinion when the medical evidence supported a different conclusion.   *See Martinez v. Chater,* 64 F.3d 172, 176 (5th Cir. 1995).

### B.   Spinal Cord Damage

Next, Ratliff contends that the ALJ ignored the presence of his spinal cord damage and failed to consider his October 22, 2010, post-operative visit.   (R. Doc. 12) Plaintiff also contends that the ALJ failed to consider an examination a few days later that revealed decreased left arm, wrist, and hand strength, and also that Dr. Summers provided Ratliff with physical therapy. (*Id.* at 10) The Plaintiff further contends that although worsening of his condition was a risk the doctor advised of him, by December 2012, his condition had worsened and he was diagnosed with Myelomalacia, which is softening of the spinal cord.[2] (*Id.* at 11).   As a result, the Plaintiff contends that the ALJ's opinion is not based upon substantial evidence.

The Commissioner contends that the ALJ properly considered the December 2010 computerized tomography (CT) scan, which showed "no unexpected post – operative findings." (R. Doc. 10). The Commissioner further contends Ratliff's complaints of left-sided weakness were inconsistent with the physical examination results, which indicated equal muscle strength, bulk and tone. (Tr. 38, 1267-71). The Commissioner contends that while Ratliff disagreed with the finding, he has failed to point to any evidence contradicting the finding. (R. Doc. 16).

The record indicates that the ALJ considered the October 22, 2010, narrative in which

---

[2]**Myelomalacia is the** morbid softening of the spinal cord. THE FREE DICTIONARY,
http://medical-dictionary.thefreedictionary.com/myelomalacia (last visited October 14, 2015).

Ratliff complained to Dr. Summers that he had bilateral hand numbness and tingling, left lower extremity weakness, and left hip pain. However, the ALJ also noted that during the physical examination, Ratliff had 5/5 muscle strength in all areas of the upper and lower extremities, including grip strength and he was recommended for a follow up in six months. Also, contrary to Ratliff's suggestion, on December 26, 2012, Dr. Espinoza did not find that Ratliff had hyperreflexia.   In fact, he noted that the cervical spine radiographs showed no canal stenosis. (Tr. 1275)   It is true that the January 8, 2013, progress notes indicate that Ratliff, according to Dr. Espinoza, had significant hyperreflexia[3] in both upper extremities and he expressed concern that he had a building disk problem. (Tr. 1286)

An MRI was conducted on February 28, 2013, at North Oaks Health System Radiology Department, which appears to be the last evidence of a medical treatment or a diagnostic evaluation.   The report indicates that Ratliff was diagnosed with cervical spondylosis with myelopathy, a dysfunction of the spinal cord resulting in a slow functional decline.[4]

The report also indicates that at the C3-4 level, there is a large central disc extrusion superimposed on a broad-based disc bulge inferiorly posterior to the C4 vertebral body flattening of the cord, with hyper-intense signal[5] within the cord at that level.   Bilateral facet hypertrophy was also identified with moderate to severe bilateral neural foraminal narrowing, which means

---

[3] Hyperreflexia is an exaggeration of the deep tendon reflexes. It may be generalized, regional or focal. THE FREE DICTIONARY, http://medical-dictionary.thefreedictionary.com/hyperreflexia (last visited October 14, 2015).

[4] UNITED STATES LIBRARY OF MEDICINE – NATIONAL INSTITUTE OF HEALTH, www.ncbi.nlm.nih.gov/pmc/PMC269878 (last visited October 14, 2015).

[5] Hyper-intense signal is the hydration of nucleus pulpous signal area. It has different tissue characteristics compared to normal tissue. MAXIMILIAN F REISER, ET AL, MAGNETIC RESONANCE TOMOGRAPHY 557 (2007).

that the nerve passageways in the spine on both the right and left sides have less space than they previously had, which could lead to a pinched nerve.[6]   At the C3-4 level, according to medical literature, this often causes pain, tingling and sometimes numbness in the arms, neck, head and shoulders.[7]   The MRI report is the last record regarding Ratliff's care.

While it supports a finding of neck pain and some arm pain, there is no medical evidence in the record that supports a complete sensation loss in the bilateral hands.   Therefore, the ALJ's conclusion that there is no medical evidence supporting arm and hand limitations is supported by substantial evidence.

### C.   <u>Limitation in Concentration, Persistence and Pace</u>

Next, Ratliff contends that the ALJ's finding that he had only mild limitations in concentration, persistence or pace is not supported by substantial evidence.   Ratliff points to the findings of consultative examiners Sandra Durdin, Ph.D. and Alan Coe, M.D., who concluded that Ratliff had a moderate limitation in concentration, persistence or pace due to his pain and the effects of the medication, rather than his psychiatric condition. Ratliff contends pursuant to SSR 96-7 that even if he was only mildly limited due to his mental impairment, the ALJ was required to consider the effects of pain and the side effect of medications.

The Commissioner contends that the examination that Ratliff relies upon was conducted seven months before the relevant period and is, thus, irrelevant. The Commissioner further

---

[6] Bilateral Stenosis, LASER SPINE INSTITUTE. https://www.laserspineinstitute.com/back_problems/foraminal_stenosis/bilateral_stenosis/ (last visited October 14, 2015).

[7] HEATHLINE.COM, Body Maps C3, http://www.healthline.com/human-body-maps/c3-cervical-vertebrae (last visited October 14, 2015).

contends that Dr. Durdin actually concluded that Ratliff's concentration was adequate, which directly contradicts the subsequent, moderate limitation.   The Commissioner further suggests that Ratliff was only mildly impaired in his ability to maintain attention and in the performance of simple, repetitive tasks for two hour blocks of time.

The ALJ found that Ratliff had no "severe" mental impairment and no medically determinable substance abuse disorder.   He pointed out that during the psychological consultative examination with Dr. Durdin, Ratliff was observed to be jovial and outgoing, albeit with some hyper-arousal.   The ALJ noted that Ratliff made various complaints and denied any psychiatric evaluation.   The ALJ noted that even with the medications he was taking, he had an adequate ability to understand, remember and carry out simple and detailed instructions.   He further noted that there were no serious cognitive deficits and no impairment in his ability to relate to others. (R.Doc. 11-2)

The record also shows that the ALJ considered the psychiatric evaluation of Dr. Alan Coe, who concluded that Ratliff had a "total lack of insight" because he remained convinced that he was having a cardiac event and absolutely denied that his symptoms could be related to anxiety and effect from longstanding Xanax and OxyContin use. (Tr. 30-31)   The ALJ noted that Ratliff appeared extremely anxious even though he continued to take "quite a bit" of Xanax. He further noted that Ratliff appeared alert to hyper-alert and clearly anxious during the examination, but otherwise logical and fully oriented. (Tr. 31)

In reviewing the record, the Court observes that Dr. Durdin described Ratliff as alert and oriented in all spears with a normal pace and adequate attention and concentration. (Tr. 393) He further noted that, while Ratliff was jovial and he did not always listen well, his speech could

be understood, his vocabulary was adequate, and his thought content and organization were logical.   (Id.)   He noted that Ratliff was taking a lot of medication, which may have been the reason he was mildly hyper-aroused.   (Id.)   He concluded that Ratliff had no psychiatric intervention. (Id.).

Despite the findings of adequate attention and concentration and normal pace, Dr. Durdin concluded that Ratliff's ability to sustain effort and persist at a normal pace over the course of a forty-hour workweek is impaired moderately by the effects of pain and medication. (Id.) Dr. Durdin diagnosed Ratliff with anxiety disorder and ruled out adverse effects of prescribed medication. (Tr. 393).

The medical report of Dr. Coe, contrary to the assertion of Plaintiff does not express a finding of moderate limitations but clearly notes that Ratliff lacked insight and that he excessively used the defense mechanism of denial, which made it difficult to treat him.   (Tr. 561)   Dr. Coe further noted that although Ratliff was very limited in the information he supplied, he was alert to hyper-alert, well-developed, and well-nourished. Dr. Coe further noted that touch was congruent and his thinking was logical, goal-oriented and relevant.   (Tr. 560) Dr. Coe further noted that Ratliff did not suffer with hallucinations, delusions, or paranoia and that cognitively he was oriented, with his recent and remote memory intact, and his IQ was within normal limits.   (Id.) Dr. Coe diagnosed Ratliff with panic disorder.   (Id.)

The evaluation of a disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation such impairment may impose on the individual's ability to work and whether these limitations are expected to last for a continuous period of at least twelve months.   *Mosby v. Apfel*, 2000 WL

174897, at *3 (E.D. La. Feb. 14, 2000); *Richard v. Secretary of HHS,* 894 F. Supp. 1045, 1052 (E.D. Tex. 1995). "Disability" is a legal status that is determined by the ALJ after evaluating expert medical and vocational findings; however, the ALJ's determination must be supported by substantial evidence.   *See Richardson v. Perales*, 402 U.S. at 401, 91 S.Ct. 1420 (1971).   The inquiry necessarily becomes whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached by the ALJ.   *Id*.

In considering, Dr. Durdin's report, where he found no limitations or restrictions but yet concluded that Ratliff was mildly limited, the Court finds that the ALJ's finding of a mild limitation and not marked limitation is supported by substantial evidence. In reviewing the ALJ's opinion, it is noted that he considered the disabling effects of pain reported by Ratliff but also found that his assertions were subjective, differing, conflicting and inconsistent. (Tr. 40)   The ALJ generally has the discretion to determine the disabling effects of pain and his decision is entitled to considerable weight.   *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001) Further there is no evidence in the record indicating that when Ratliff took his pain medication he had certain side effects that impeded or affected his ability to work.

### D.    <u>Abuse of Discretion</u>

The final error assigned by Ratliff is that the ALJ engaged in a "bait and switch" when he made findings that are not supported by the record evidence in order to avoid complying with the Appeals Council's order to obtain vocational expert testimony. Specifically, relying upon *Albright v. Comm'r of Soc. Sec. Admin,,* 174 F.3d 473, 477-78 (4th Cir. 1999), Ratliff alleges that in order to avoid having to find a severe mental impairment, the ALJ strategically changed his finding, in his now vacated order, from a moderate limitation in concentration, persistence

and pace to only a mild limitation.   He also contends that in order to avoid having to obtain the testimony of a vocation expert, the ALJ changed his now vacated RFC finding from sedentary to light such that Ratliff remains capable of his past light work given his non-exertional limitations.

The Commissioner contends that the ALJ acted within the scope of his authority in determining that Ratliff could perform a full range of light work.   The Commissioner also notes that the ALJ is not bound by his findings in a prior vacated decision and that because the matter was remanded he was free to reevaluate the facts.

The ALJ noted that Ratliff previously worked as a waiter and resident training specialist. He noted the testimony of the prior vocational expert that his past work as a waiter was light and semiskilled. He further held that based upon the testimony of the vocational expert from the prior hearing his past relevant work as a waiter is within his current residual functional capacity. (Tr. 44).

Most of the lower courts that have addressed the issued have held that *Albright* and AR 00–1(4)[8] do not apply because the prior ALJ's decisions were not the agency's final decisions. In *Batson v. Colvin,* 2015 WL 1000791, at *7 (E.D.N.C. Mar.5, 2015), the court held that "*Albright* did not require the second ALJ to consider the first ALJ's decision because that decision had been vacated, and thus no finding remained to be considered in the subsequent determination." The

---

[8]AR 00-1(4) interpreted *Albright* "to hold that where a final decision of SSA after a hearing on a prior disability claim contains a finding required at a step in the sequential evaluation process for determining disability, SSA must consider such finding as evidence and give it appropriate weight in light of all relevant facts and circumstances when adjudicating a subsequent claim involving an unadjudicated period." 2000 WL 43774, at *4. Pursuant to AR 00–1(4), the ALJ must consider the following factors: (1) whether the fact on which the prior finding was based is subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition; (2) the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and the period being adjudicated in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim. *AR 00-1(4)* (S.S.A.), 2000 WL 43774.

Court cited *Monroe v. Colvin,* C/A No.: 7:13–74–FL, 2014 WL 7404136, at *2 (E.D.N.C. Dec.30, 2014), in which the Court stated "[c]ontrary to plaintiff's argument, however, the ALJ was not required to give weight to the findings made in the 2010 decision, because it was vacated and not the final agency decision of the Commissioner," and *Williams v. Colvin,* C/A No. 7:12–242, 2013 WL 5151797, at *4 (W.D.Va. Sept.13, 2013), in which the court stated "both of the prior ALJ decisions in this case were vacated, and thus there was no 'prior finding' to be afforded any weight under SSAR 00–1(4)." *Batson,* 2015 WL 1000791, at *7.   Most recently, in *Myers v. Colvin,* C/A No. 1:13–898, 2015 WL 4366201, at *3 n. 4 (M.D.N.C. July 16, 2015), the court indicated in a footnote that the ALJ was not required to give weight to the prior ALJ's findings because that decision had been vacated by the Appeals Council.   Further, once the case is remanded, the ALJ is free to reevaluate the facts as done in this case.   *See Houston v. Sullivan*, 895 F.2d 1012,1015(5th Cir. 1989.

In view of the foregoing, the ALJ did not err when he reevaluated the facts and reached a different RFC finding from that of the vacated decision. Because the Appeals Council vacated the earlier decision, it was not a final determination. The majority of the non-binding case law suggests that *Albright* and AR 00–1(4) require no consideration of the prior decision under these circumstances.

**VI.**   <u>**Recommendation**</u>

It is the **RECOMMENDATION OF THIS COURT** that the ALJ's decision denying Tommy J. Ratliff's Supplemental Security Income be **AFFIRMED.**

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a Magistrate Judge's Report and Recommendation **within ten (10) days** after

17

being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.   *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996).

New Orleans, Louisiana, this 20th day of October 2015

**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**

18